UNITED STATES DISTRICT COURT               FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

---

CHERYL Y. WEBSTER,

                              Plaintiff,                MEMORANDUM
                                                        AND ORDER
            - versus -                                  13-CV-2580 (JG)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

---

APPEARANCES:

        LAW OFFICE OF HARRY J. BINDER AND CHARLES E. BINDER, P.C.
                60 East 42nd Street, Suite 520
                New York, NY 10165
        By:     Charles E. Binder
                *Attorneys for Plaintiff*

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201
        By:     Arthur Swerdloff
                *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Cheryl Webster seeks review, pursuant to 42 U.S.C. § 405(g), of the

Commissioner of Social Security's (the "Commissioner") denial of her application for Social

Security Disability ("SSD") benefits.  Webster seeks a judgment remanding the case to the

Commissioner solely for the calculation and award of benefits.  The Commissioner admits that

the Administrative Law Judge ("ALJ") made certain errors in denying Webster's application and

also moves for a remand.  However, the Commissioner seeks a remand for further consideration

of Webster's application.  I heard oral argument on January 10, 2014.  For the reasons that

follow, Webster's motion for judgment on the pleadings is granted, the Commissioner's motion is denied, and the case is remanded solely for the calculation of benefits.

BACKGROUND

A.  *Facts and Procedural History*

Webster was born in 1964, R. 844, and has a high school education.  R. 846.  She worked for the United States Postal Service as a letter carrier for over seventeen years, from March 1987 through December 2003.  R. 214, 788.  Webster seeks a determination of disability for lumbar disc disease, cervical disc disease, left shoulder degenerative joint disease, rotator cuff tendonitis, obesity and multifocal pain syndrome.  Webster first filed an application for SSD benefits almost ten years ago, in March 2004, alleging disability since December 29, 2003, due to back and cervical spine injuries and arthritis.  R. 262, 731.  Her application was denied on August 17, 2004, R. 79-82, and Webster requested a hearing before an ALJ.  R. 86.  The hearing was held nearly three years later, on June 5, 2007, before ALJ Hazel Strauss, at which Webster was represented by counsel.  R. 840-65.  On June 27, 2007, ALJ Strauss found that Webster was not disabled.  R. 44-56.  Webster appealed the ALJ's decision, R. 108, and on March 25, 2009, the Appeals Council remanded her claim for a new hearing.  R. 119-122.

A second hearing was held before ALJ Strauss on September 22, 2009.  R. 814-839.  At this hearing, Webster amended her alleged onset date to October 1, 2007.  R. 818-19.  In a decision dated November 25, 2009, ALJ Strauss again found that Webster was not disabled.  R. 57-76.  Webster again requested that the Appeals Council review the ALJ's decision, R. 138, and on September 15, 2010, Webster's claim was remanded for yet another hearing before an ALJ.  R. 149-52.  The Appeals Council ordered the ALJ to: obtain testimony from a medical expert, preferably a specialist in orthopedics; consider the effects of Webster's obesity in conjunction

2

with her musculoskeletal impairments on her ability to function; and obtain evidence from a vocational expert regarding the effect of the assessed limitations on Webster's "occupational base."  R. 151.

This third hearing took place before ALJ Marilyn Hoppenfeld on August 19, 2011.  R. 729-812.  The ALJ issued a decision on July 11, 2012, finding that Webster is not disabled.  R. 16-42.  Webster continued to allege an onset date of October 1, 2007.  R. 739-40. At the hearing, the ALJ agreed that based upon subsequently posted non-work income, Webster's date last insured is December 31, 2010.  R. 754.  However, in her decision, the ALJ considered whether Webster was disabled between December 29, 2003 (instead of October 1, 2007) and December 31, 2007 (instead of December 31, 2010).  R. 21.  Webster again requested review of the decision by the Appeals Council, but that request was denied on March 26, 2013, making the ALJ's decision the final decision of the Commissioner.  R. 8-10.

Webster filed a complaint in this court on April 29, 2013, seeking reversal of the Commissioner's decision.  *See* ECF No. 1.  On September 24, 2013, Webster moved for judgment on the pleadings, seeking remand solely for the calculation and award of benefits.  *See* ECF No. 11.  The Commissioner filed a motion to remand for further proceedings on November 22, 2013, admitting, *inter alia*, that the ALJ had erred in considering Webster's date last insured as December 31, 2007, instead of December 31, 2010, but requesting an opportunity to readjudicate Webster's application.  *See* ECF No. 16.

B.  *Webster's Testimony*

Webster testified that she lives in a house with her husband and three of her four children, ages 8, 17, and 23.  R. 742.  She is 5 feet 3 inches tall, and at the hearing weighed approximately 230 pounds, but in 2007 weighed between 270 and 280 pounds.  R. 743-44.

3

Webster stated that her family owns an SUV with an automatic transmission, which she drives occasionally, but with some discomfort.  R. 745-46, 772.  She visits her mother, who lives a short drive away, once per week, sometimes driving herself and sometimes being driven by her husband.  R. 745-46.  Webster is not comfortable driving when she is taking her pain medication, R. 746, and has not taken public transportation for several years.  *Id.*  She has not taken any trips since 2007.  R. 772.

Webster worked full-time for the Postal Service from 1987 to 1989 as a letter carrier driving a truck.  R. 750-51.  She suffered an injury on the job in 1989 and received worker's compensation until 1993, when she resumed part-time employment with the Postal Service for a year as a letter sorter, R. 789, and then as a letter carrier on foot.  R. 752.  She continued working part-time as a letter carrier from 1994 until December 2003, when she stopped working because of severe chronic pain in her back, neck, and shoulder, which often radiated into her arms and legs.  R. 754-55, 846, 850.

Webster testified that if she walks more than about a block, her pain increases in her back and down her left leg to her hip, knee and foot.  R. 771.  She is unable to kneel for the same reason.  R. 771-72.  She stated she is able to stand for about ten minutes but cannot bend over and pick something off of the floor.  R. 772.  She can sit without pain for approximately 20 to 30 minutes.  *Id.*  She testified that she can lift about five pounds, R. 773, but that she has difficulties gripping things with her left hand.  R. 784-5.  Webster can raise her left arm to slightly above waist-level before it becomes too painful.  R. 767.  Webster stated that her husband and children do the cooking, shopping, laundry, and cleaning around the house because she is unable to.  R. 774-75.  Her pain is minimized when she is lying down, so she spends most

4

of her days lying on her back listening to the radio, watching television, and sleeping.  R. 775.

She sometimes needs help getting dressed.  R. 784.

Webster has not been hospitalized except for giving birth to her children.  R. 757.

She has been taking pain killers for her neck, shoulder, and back pain since 2003, R. 755, and

was scheduled to have an operation on her shoulder in July 2011, but decided against such

invasive treatment, in part because she did not feel she had anyone to help her recover after the

surgery.  R. 769.

C.  *Medical Evidence*

1.  *Evidence Prior to Webster's Alleged Onset Date, October 1, 2007*

Dr. Carlisle Saint Martin treated Webster regularly from at least January 2004

through May 2007.  *See* R. 298-99, 251-52, 265, 297, 341-42.  Based on a physical examination

and an MRI, Saint Martin diagnosed Webster with lumbar disc disease and determined she was

totally disabled in February 2004.  R. 298.  Saint Martin continued to treat Webster for pain in

her back, neck and shoulder over the next several years, and on February 21, 2006, an MRI of

Webster's cervical spine revealed further disc herniations, including a herniation effacing the

ventral CSF space with cord contact.  R. 265-68.  After reviewing this MRI, Saint Martin

additionally diagnosed Webster with cervical disc disease and chronic pain, and stated that she

was still totally disabled.  *Id.*

As part of her application for SSD benefits, Webster was also evaluated by

several consulting physicians in the years before her current alleged onset date.  In June 2004,

Dr. Kyung Seo conducted a consultive orthopedic examination and noted that Webster had

limited range of motion in the cervical and lumbar spines and diagnosed her as obese and

suffering from myofascial pain in the lower back and neck.  R. 254-55.  Dr. Richard Johnson

5

performed a neurological evaluation on March 20, 2006. R. 271. He diagnosed Webster with nonsurgical discogenic degenerative disease, and noted her limited range of motion and "morbid obesity." *Id.* On October 31, 2006, Dr. Steven Calvino conducted a consultative orthopedic examination and diagnosed Webster with chronic neck and back pain, asthma, and eczema. R. 273. He opined that Webster's ability to stand, walk, push, and pull were not affected by her impairments. R. 276-77. Dr. Mohamed Nour examined Webster on March 21, 2007. R. 282-87. Nour recorded limited range of motion of the cervical and lumbar spines based on a motor examination, and diagnosed a chronic lumbar sprain/strain, cervical disc herniation, internal derangement of the right knee, and internal derangement of the left shoulder. R. 287. He concluded that Webster was permanently and totally disabled. R. 286.

    2.   *Medical Evidence After the Alleged Onset Date, October 1, 2007*

        a.   *Orlin & Cohen Orthopedic Associates LLP*

        Webster was treated by several physicians from Orlin & Cohen Orthopedic Associates, LLP starting on her alleged onset date, October 1, 2007. Dr. Michael Shapiro, her primary treating physician, began treating Webster that day. R. 315. Webster presented with severe neck and shoulder pain, and reported a history of back pain. *Id.* Shapiro's examination revealed "spasm and tenderness to palpitation and percussion" in Webster's cervical spine, as well as restricted range of motion. *Id.* Motor power and sensation of her cervical spine were normal. *Id.* Shapiro diagnosed impingement and impingement reinforcement of Webster's left shoulder, R. 316, and dysrhythmia of her lumbar spine. *Id.* He recorded tenderness in the lumbar spine to palpitation and percussion and pain with "straight leg raising left." *Id.* X-rays of her cervical spine showed straightening, but x-rays of her shoulder showed that it appeared "grossly within normal limits." *Id.* Shapiro reviewed a previous MRI that showed multilevel

herniated disc in the cervical spine.  *Id.*  He prescribed Ultracet for the pain, home cervical

traction, and MRIs of her cervical spine and shoulder.  *Id.*

       An MRI of Webster's spine conducted on October 26, 2007, showed posterior

cervical disc herniations at C2-3, C3-4, C5-6, and C6-7.  R. 319.  An MRI of Webster's left

shoulder conducted on the same day showed rotator cuff tendinitis, acromioclavicular joint

degenerative disease, and minimal glenohumeral joint effusion.  R. 320.  On November 9, 2007,

Webster was again seen by Dr. Shapiro for neck pain.  R. 317.  Shapiro recommended that she

see Dr. Eric Price for her shoulder and Dr. Adam Hammer for epidural steroid injections; he also

prescribed Vicodin ES for her pain.  R. 318.

       Dr. Hammer saw Webster on November 16, 2007.  R. 382-85.  Webster reported

neck and lower back pain that occasionally radiated into her left leg accompanied by significant

numbness and tingling.  R. 382.  Hammer's examination revealed an antalgic gate (a limp

characterized by a short stance phase); limited lumbar and cervical range of motion in all planes;

positive diffuse tenderness to palpation along the lumbar and cervical spines; straight leg raising

produced back and buttock pain at 70 degrees; sensation grossly intact to light touch on both

cervical and lumbar spines; positive reproductive pain on resisted abduction external rotation of

the left shoulder; and reproductive pain in the shoulder girdler.  R. 384.  Hammer reviewed the

recent MRIs and recorded disc dessication and bulging at L4-5.  An earlier electromyography

("EMG") showed radiculopathy at C6-7.  *Id.*  He diagnosed Webster with cervicalgia, herniated

cervical discs, lumbago, and herniated lumbar discs, and he requested authorization for three left-

sided transforaminal epidural steroid injections.  R. 384.

      Dr. Hammer completed a Multiple Impairment Questionnaire dated November

29, 2007, in which he stated that Webster was being treated monthly.  R. 332.  Hammer

diagnosed Webster with cervicalgia, cervical herniated nucleus, lumbar radiculitis, lumbago, lumbar herniated nucleus pulposus, and cervical radiculitis. *Id.* He stated that her prognosis was poor. *Id.* As "clinical findings" that supported his diagnosis, he listed: limited range of motion in the lumbar spine; diffuse tenderness to palpation along the lumbar spine; limited range of motion in the cervical spine; and reproductive tenderness to palpation of the cervical spine and in the scapular area. *Id.* He listed the MRIs of Webster's lumbar and cervical spine as laboratory and diagnostic test results supporting his diagnosis. R. 333. Hammer estimated both Webster's pain and fatigue as between a 9 and 10 on a scale of 1 to 10, although he indicated that he had been able to completely relieve the pain with medication without unacceptable side effects. R. 334. In an eight-hour workday, Hammer estimated that Webster could sit for less than an hour and stand/walk for less than an hour. *Id.* He indicated it would be necessary or medically recommended for Webster not to sit continuously or to stand/walk continuously in a work setting, and that Webster would need to get up and move around every 10-15 minutes for 10-15 minutes. *Id.* Hammer reported that Webster could lift and carry up to 5 pounds occasionally, but could never lift or carry anything heavier. R. 335. Webster had minimal limitation in grasping, turning, and twisting objects, using her fingers and hands, and using her arms for reaching. R. 335-36. He opined that Webster's symptoms would likely increase in a competitive work environment and that her condition prevented her from keeping her neck in a constant position (looking at a computer screen or desk). R. 336. Webster's pain and other symptoms would frequently interfere with her attention and concentration, and Hammer expected her impairments to last more than 12 months. R. 337. Hammer estimated Webster would need to miss an average of two to three days of work per month, and would not be able to push, pull, kneel, bend, or stoop. R. 338.

8

Webster was evaluated by Dr. Price on November 27, 2007.  R. 354.  Price noted that Webster's range of motion in her left shoulder was mildly decreased and that Webster reported pain "at the end points of all ranges of motion," but that there was no swelling or deformity.  *Id.*  He diagnosed Webster from these clinical findings and reviewing the recent MRIs with left shoulder impingement syndrome, possible rotator cuff tendinitis, and HNP (herniated discs) in the cervical and lumbar spines.  R. 355.  He recommended a Cortisone shot into the subacromial space in her shoulder and physical therapy.  *Id.*

Webster saw Dr. Price for a follow-up for her shoulder on February 8, 2008.  R. 358.  Webster reported that the Cortisone shot helped her pain significantly, but that the pain had returned, and that she had decreased grip strength in her left arm.  *Id.*  A physical examination showed mildly decreased range of motion and signs of impingement but no atrophy or winging of the shoulder.  *Id.*  He again diagnosed Webster with left shoulder pain, impingement syndrome in her left shoulder, as well as possible radicular symptoms in the left upper extremity.  R. 359.  He requested an EMG of the left upper extremity to further evaluate for pathologic anatomy.  *Id.*

Dr. Shapiro followed up with Webster regarding her back, neck, shoulder, and leg impairments on February 27, 2008.  R. 376.  He diagnosed Webster with sacroiliitis and lumbago, prescribed her Vicodin for the pain, and requested authorization for acupuncture.  R. 377.  On April 23 Shapiro again saw Webster, recorded the same diagnosis and requested authorization for physical therapy, acupuncture and lumbar epidural steroid injection.  R. 560.  Shapiro's findings and diagnosis were substantially unchanged on further examinations conducted on June 25 and October 8.  *See* R. 571-72, 561-62.  At these examinations Shapiro noted muscle spasm and diminished cervical and lumbar range of motion in all planes.  *Id.*  He prescribed Flector

patches and Vicodin, and stated that Webster had a total disability.  R. 561.  Shapiro's

examinations on January 28, March 19, April 20, May 18, and June 29, 2009, revealed

substantially similar results.  *See* R. 565-56, 567-68, 573-74, 563-64, 569-70.

Dr. Shapiro completed a Multiple Impairment Questionnaire dated May 8, 2009.

R. 365-72.  In this questionnaire he stated that he had treated Webster monthly from October 1,

2007, through April 20, 2009.  R. 365.  He again listed his diagnosis as lumbago and sacroilitis,

not elsewhere classified.  *Id.*  His prognosis was guarded.  *Id.*  The positive clinical findings in

support of this diagnosis were: diminished range of motion in Webster's neck; and severe pain,

muscle spasm and diminished flexibility, extension, rotation and lateral bending of both her

cervical and lumbar spines.  *Id.*  He noted "see attached" for the laboratory and diagnostic test

results that supported his diagnosis but the record is not clear what results were attached.  R. 366.

Shapiro stated that Webster suffers daily from neck, back and shoulder pain, and that lifting,

pushing, pulling, standing, walking and carrying are precipitating factors leading to the pain.  R.

366-67.  He estimated Webster's pain as 8 to 10 out of 10, and her fatigue at 6 to 8 out of 10, and

reported that he had not been able to completely relieve the pain with medication without

unacceptable side effects.  R. 367.  In an eight-hour workday, Shapiro estimated Webster could

sit for 2 to 4 hours and stand/walk for 10 to 15 minutes.  *Id.*  He stated it was medically

necessary for Webster not to sit continuously in a work setting, and that Webster would need to

get up and move around every 10 to 15 minutes for 10 to 15 minutes.  R. 367-68.  Shapiro

reported that Webster could lift and carry up to five pounds occasionally, but never anything

heavier and that she had significant limitations in repetitive reaching, handling, fingering or

lifting.  R. 368.  He stated she would be essentially precluded from twisting objects with her

upper extremities and using her arms for reaching (including overhead) during an eight-

10

workday.  R. 368-69.  Shapiro reported that Webster's symptoms were likely to increase in a competitive work environment, and that her condition interfered with her ability to keep her neck in a constant position.  R. 369.  He opined that Webster was not a malingerer.  R. 370.  He estimated Webster would be absent from work more than three times per month due to her impairments, and that she would not be able to push, pull, kneel, bend, or stoop as a part of a job.  R. 371.

        b.  *Louis Tranese, D.O.*

        Dr. Louis Tranese evaluated Webster at the request of the ALJ on July 23, 2009, but he did not review her medical records or other diagnostic reports.  R. 575.  Webster complained to Tranese of daily, persistent and severe neck and low back pain that radiates down her left leg.  R. 575.  She reported her baseline pain grade as an 8 or 9 out of 10.  *Id.*  Webster was prescribed Vicodin, Ambien, and Flector patches and stated that she relied on her family for cooking, cleaning, laundry and shopping but could bathe, dress, and groom herself independently, depending on pain intensity.  R. 576.  Webster appeared in moderate acute distress with a nonantalgic gait and decreased step length and cadence.  *Id.*  Webster's cervical and lumbar spine flexion and extension were limited by pain, and she demonstrated cervical and lumbar paraspinal tenderness on the left side.  R. 577.  Webster had no sensory abnormality in her upper extremities, her grip strength was 5/5 bilaterally, and her reflexes were physiologic and equal.  *Id.*  Tranese diagnosed chronic neck and low back pain, left shoulder pain, and a reported history of left lower extremity sciatica.  R. 578.  He reported that Webster had severe limitations in heavy lifting, squatting, and forward bending; mild to moderate limitations with frequent stair-climbing; moderate limitations tolerating long-distance walking; mild to moderate limitations sitting or standing for long periods; mild to moderate limitations performing repetitive overhead

activities with her left arm; and moderate limitations lifting and carrying heavy objects with her left arm. *Id.* He stated that she had no limitations using her hands for fine and gross activities. *Id.*

The same day, Dr. Tranese completed a statement of Webster's ability to do work-related activities. R. 578A-83. He estimated that Webster could occasionally lift and carry up to 10 pounds, but never more. R. 578. Tranese stated that Webster could sit for one hour at a time, stand for 30 minutes at a time, and walk for 30 minutes at a time. R. 579. In an eight-hour workday Tranese estimated Webster could sit for five hours, stand for three hours, and walk for two hours. *Id.* With her left hand he stated that Webster could occasionally reach overhead, frequently reach not over her head, continuously handle, finger, and feel, and frequently push/pull. *Id.* Tranese estimated Webster could occasionally climb stairs and ramps, never climb ladders or scaffolds, never crawl, and occasionally could balance, stoop, kneel, and crouch. R. 581. Finally, Tranese reported that Webster could not perform activities like shopping, but could: travel without assistance; walk a block at a reasonable pace over rough or uneven terrain; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, and use paper files. R. 583.

c. *Dr. Phillip Fyman*

Dr. Phillip Fyman, an anesthesiologist and specialist in pain medicine, examined Webster on September 30, 2009. R. 615-18. Fyman reviewed Webster's medical records and several MRIs of Webster's cervical and lumbosacral spines. R. 615-16. Fyman noted a marked decreased range of motion and pain on palpation of the both the cervical and lumbosacral spines. R. 616. He diagnosed cervical and lumbar radiculopathies, myofascial pain and muscle spasms

12

of the upper and lower back, and shoulder pain.  R. 617.  He determined that the symptoms apparent in Webster's neck, cervical spine, lower back and left shoulder are directly related to a work accident suffered in 1987 and exacerbated in 1989.  *Id.*  Fyman recommended that Webster be seen on a monthly basis by a pain specialist and undergo a 12-week course of physical therapy.  *Id.*  Fryman stated that due to severe pain, Webster is unable to shop, cook, or clean her house.  R. 618.  He stated that any bending or lifting should be severely restricted, and that she is unable to carry anything heavier than five pounds.  *Id.*  Fyman estimated that Webster is unable to stand for more than 15 to 20 minutes without resting.  *Id.*  He concluded that Webster has a marked permanent disability with regard to her cervical and lumbar spines, is unable to do full-time work, and that her prognosis for recovery is poor.  *Id.*

Dr. Fyman also completed a Multiple Impairment Questionnaire that largely mirrored his conclusions outlined above.  *See* R. 619-626.  Based on the MRI reports and his physical examination of Webster, Fyman stated that she could sit for only three hours and stand/walk for only one hour in an eight-hour workday.  R. 620-21.  He reported that Webster should not sit continuously in a work setting, must get up to move around once per hour, R. 621, and would need to take breaks for 10 to 15 minutes every 10 to 15 minutes.  R. 624.  Fyman opined that Webster was essentially precluded from grasping, turning, and twisting objects with her left hand, and moderately limited from such actions with her right hand.  R. 622.  Similarly, he determined that Webster is essentially precluded from using her left fingers/hands for fine manipulations or for reaching (including overhead), and that she is moderately limited in doing these actions with her right hand.  R. 623.  He stated that Webster's symptoms would likely increase in a competitive work environment and that her impairments would keep her from concentrating and cause her to miss work more than three times per month.  R. 624-25.

d. *Dr. Lawrence Grosswirth*

Webster's treating chiropractor, Dr. Lawrence Grosswirth, began treating Webster twice per month on January 21, 2004, R. 322, and completed a Multiple Impairment Questionnaire dated November 16, 2007. R. 322-29. He diagnosed Webster with cervical and lumbar spine disc herniations and listed her prognosis as poor. R. 322. He estimated Webster could sit for one hour and stand/walk for one hour in an eight-hour work day. R. 324. According to Grosswirth, Webster could occasionally lift and carry up to ten pounds, and was essentially precluded from grasping and twisting objects with either hand, or reaching (including over her head) with either hand. R. 325-26. He determined that Webster's symptoms would increase in a competitive work environment and that she is unable to keep her neck in a constant position. R. 326.

3. *Medical Evidence After the Date Last Insured, December 31, 2010*

a. *Dr. David Finkelstein*

Dr. David Finkelstein conducted a consultative neurological evaluation of Webster on referral from the ALJ on October 11, 2011. R. 718. He apparently did not review any of Webster's medical history or diagnostic test results. *See* R. 722. Finkelstein noted Webster's complaints of pain in her neck, left shoulder, back, leg and foot, and conducted a physical exam. R. 718. Webster did not need assistance changing for the exam or getting on and off of the exam table. R. 719. Finkelstein rated her grip strength 5/5, although noted breakaway pain on the left hand. R. 719. He recorded normal range of motion of her cervical spine, and lumbar spine range of motion limited to 10 degrees in all axes. R. 719. Finkelstein reported Webster had 5/5 strength of her upper and lower extremities and normal muscle tone. R. 720. He diagnosed her with multifocal pain condition, possibly related to arthritis or spinal stenosis

14

and listed her prognosis as fair.  R. 720.  He noted that Webster's pain may limit her ability to sustain activities, and recommended a rheumatologic evaluation.  *Id.*

In a Medical Source Statement of Ability to do Work-Related Activities, Dr. Finkelstein estimated that Webster could continuously lift and carry up to 20 pounds, frequently lift and carry between 21 and 50 pounds, and occasionally lift and carry 51 to 100 pounds.  R. 722.  He listed "pain" as the particular medical or clinical finding that supports his assessment of Webster's limitations.  *Id.*  He stated that Webster could sit, stand, or walk for three hours without interruption, and that in an eight-hour workday, she could sit, stand, or walk for a total of eight hours.  R. 723.  Finkelstein reported that Webster could reach (including over her head), finger, handle, feel and push/pull continuously with her right hand and frequently with her left hand.  R. 724.  He estimated that she can frequently climb stairs, ramps, ladders and scaffolds, and continuously balance, stoop, kneel, crouch, and crawl.  R. 725.  He concluded that Webster was able to shop and travel without assistance.  R. 727.

b.  *Dr. Donald Goldman*

Dr. Donald Goldman, an orthopedic surgeon, saw Webster on August 9, 2011.  R. 689.  Goldman performed a physical exam and reviewed Webster's medical records, including MRIs of both her cervical and lumbar spines.  R. 690-91.  In his physical examination, Goldman noted generalized pain in Webster's left shoulder around the joints and rotator cuff, as well as pain and restricted motion of her cervical spine.  R. 690.  Based on the physical examination and review of Webster's MRIs, Goldman diagnosed cervical herniated discs C2-3, C3-4, C4-5, C5-6, C6-7; cervical derangement and right radiculopathy; left AC joint impingement syndrome with a SLAP legion; lumbar derangement and right radiculopathy; lumbar disc herniation L2-3; and multiple bulging lumbar discs.  R. 691.  As a result of these impairments, Goldman determined

15

that Webster is unable to kneel, squat, twist, or walk more than a block or two.  R. 692.  He stated that she is not able to sit for more than 20-30 minutes without pain radiating through her left buttock and thigh.  *Id.*  Goldman concluded that Webster is permanently disabled.  *Id.*  He stated that surgery was a viable option but would be extremely difficult due to the multi-level disc herniations with stenosis.  R. 693.

        Goldman also completed a Multiple Impairment Questionnaire that largely reiterated his conclusions outlined above.  R. 696.  He estimated that in an eight-hour workday Webster could sit only for 3 to 4 hours and stand/walk for 1 to 2 hours.  R. 698.  He stated that Webster would need to get up and move around every 20 to 30 minutes.  *Id.*  Goldman stated that Webster cannot lift any amount of weight, but could frequently carry up to five pounds and occasionally carry five to ten pounds.  R. 699.  He noted a marked degree of limitation on reaching (including overhead) with her left arm.  R. 700.  Webster would need to take unscheduled breaks every 45 to 60, minutes each lasting a few minutes, and he estimated that she would miss work more than three times per month as a result of her impairments.  R. 702.

D.  *Vocational Expert Testimony*

        Vocational expert Victor Alberigi testified at the August 19, 2011, hearing.  R. 787-811.  Alberigi stated that Webster's past work as a letter carrier,[1] under Department of Labor standards, is classified as medium physical demand, semi-skilled work with a Specific Vocational Preparation ("SVP") of 4,[2] R. 788, and that Webster's one year of work as a mail sorter[3] is light physical demand, unskilled work with an SVP of 2.[4]  R. 793.  The ALJ posed a

---

[1]     Dictionary of Occupational Titles ("DOT") code 230.367-010.
[2]     An SVP refers to the amount of time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES app. C (4th ed. 1991). The SVP scale ranges from 1 ("short demonstration only") to 9 ("over 10 years"). An SVP of 4 denotes necessary preparation of over three months up to and including six months.
[3]     DOT code 209.687-026.

hypothetical to Alberigi of an individual of Webster's age, education and past work experience, who was limited to sedentary work. R. 794. Alberigi stated that such a hypothetical individual could not perform Webster's past work. *Id.* If the hypothetical person was limited to sedentary work and also was limited to no frequent repetitive use of her left arm, Alberigi testified that such an individual could perform work as a surveillance system monitor[5] or a telemarketer,[6] both of which exist in significant numbers in the national and regional New York economies. R. 797. If, based on Dr. Fyman's opinion, the same individual were limited to sitting for three hours total and standing/walking for one hour total during an eight-hour workday, Alberigi testified that no work would be available. R. 801. He also testified, referring to Dr. Shapiro's opinion of Webster's limitations, that no work would be available for the same hypothetical individual who could sit for four hours and stand for less than an hour in an eight-hour workday. R. 801-02.

E.   *The ALJ's Decision*

1. *Regulatory Standards*

In order to receive disability benefits under the Social Security Act, a claimant must have been disabled during an insured period. 42 U.S.C. § 423(c); *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). To be found disabled, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant may be found disabled only if his impairment or impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[4]    An SVP of 2 designates necessary preparation beyond a short demonstration up to and including one month.

[5]    DOT code 379.367-010.

[6]    DOT code 299.357-014.

17

engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration's regulations prescribe a sequential five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation and alterations omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process).  The claimant bears the burden of proof in the first four steps, the Commissioner in the last.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

2. *The ALJ's Decision*

As previously noted, the ALJ incorrectly determined at step one of the five-step sequential analysis that Webster's date last insured was December 31, 2007, rather than the actual date last insured, December 31, 2010.  R. 21.  At the second step, the ALJ determined that Webster had not engaged in substantial gainful activity between December 29, 2003, and

December 31, 2007.  R. 22.  The ALJ next concluded, at the third step, that Webster's alleged

impairments – lumbar disc disease, cervical disc disease, left shoulder degenerative joint disease,

rotator cuff tendonitis, obesity and multifocal pain syndrome – did not meet or medically equal

the severity of one of the listed impairments because there is no evidence of the compromise of

the nerve root or spinal cord.  *Id.*  Moving to step four, the ALJ determined that through

December 31, 2007, Webster had the residual functioning capacity ("RFC") to perform "light

work" including lifting/carrying twenty pounds occasionally and ten pounds frequently, and to

sit for up to six hours and stand/walk for up to six hours in an eight-hour workday.  *Id.*  The only

limitation on Webster's ability to perform light work, according to the ALJ, was that she could

not use her left arm for "repetitive overhead reaching."  R. 23.  The ALJ determined that with

this RFC, Webster would not be able to perform her past relevant work.  R. 39-40.  Finally, at

step five, the ALJ concluded that with this RFC Webster could perform jobs that exist in

significant numbers in the national and regional economies.  R. 39.  Specifically, the ALJ found

that Webster could work as a "Surveillance Monitor" or a "Telemarketer" despite her

impairments.  R. 40.

## DISCUSSION

A.  *The Standard of Review*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine

whether the correct legal standards were applied, and whether the decision is supported by

substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The first inquiry

requires the court to determine whether "the claimant has had a full hearing under the

[Commissioner's] regulations and in accordance with the beneficent purposes of the Act."

*Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).  The second

inquiry requires the court to decide if the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also id.* ("Substantial evidence is more than a mere scintilla.") (internal quotation omitted).

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). As noted above, all parties agree that remand is necessary; the only question is whether on remand the Commissioner should be permitted yet another chance to correctly determine whether or not Webster is disabled, or if remand should be solely for the calculation and award of benefits. A remand for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, [] to have correctly applied the . . . regulations," *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004), or "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)). Alternatively, where the record establishes "persuasive proof of disability and remand for further evidentiary proceedings would serve no purpose," the court should remand solely for the calculation and payment of benefits. *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980).

B. *Errors Committed by the ALJ*

In addition to mistakenly concluding that Webster's date last insured was December 31, 2007, rather than December 31, 2010, the ALJ committed several other errors in her decision finding Webster not disabled.

1. *Failure to Observe the Treating Physician Rule*

Pursuant to the treating physician rule set out in 20 C.F.R. § 404.1527(c), a treating physician's opinion about the nature and severity of a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations).  The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight.  20 C.F.R. § 404.1527(c)(2); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (same).  She must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling.  *Halloran*, 362 F.3d at 33; *Snell*, 177 F.3d at 133 ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician.").  When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(c).

In her decision, the ALJ decided to give Dr. Shapiro's findings regarding Webster's back and neck impairments "little weight" because she believed his medical opinion was "based upon claimant's subjective complaints and not verified by any objective testing or findings."  R. 33.  She also afforded "little weight" to the questionnaire Shapiro completed detailing the limiting effects of Webster's impairments on her ability to function, *see* R. 365-72,

21

because she determined that it was completed almost two years after Webster's date last insured and because she found it "non-specific regarding the basis for the limitations specified."  R. 32.

I conclude that the ALJ's failure to give Dr. Shapiro's opinion controlling weight was in error.  Contrary to the ALJ's finding, the record makes clear that Shapiro based his medical opinions regarding Webster's impairments on objective testing and findings – namely physical examinations, MRIs, x-rays, and other diagnostic tests.  *See*, *e.g.*, R. 315-16, 319, 365-72, 377, 403-04.  While he certainly did take into account Webster's subjective complaints, his medical opinions are well-supported by, *inter alia*, his physical examinations of Webster, which revealed limited range of motion in her lumbar and cervical spines, as well as the multiple MRIs that demonstrated that Webster suffered from numerous cervical disc herniations, rotator cuff tendinitis, acromioclavicular joint degenerative disease, and lumbar disc desiccation and bulging.  *See* R. 319, 320, 384.  Regarding Dr. Shapiro's questionnaire, the ALJ's finding that it had been completed almost two years after Webster's date last insured is simply wrong – the questionnaire is dated May 8, 2009, and Webster's actual date last insured is December 31, 2010.

Dr. Shapiro's opinions are also not contradicted by other substantial evidence in the record.  To the extent that the medical opinions of the consulting physicians, Dr. Finkelstein and Dr. Tranese, contradict Shapiro's opinion, it is well-established that "in evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *see also Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the findings of consultative physicians after a single examination.").  These consultants each examined Webster only once, and neither reviewed any of the MRIs, x-rays, or other diagnostic test results as part of their examinations.  *See Burgess v. Astrue*, 537 F.3d 117, 132 (2d Cir. 2008) (holding the report of a consultative

22

examiner who failed to review a relevant MRI report is not substantial evidence); *Cruz*, 912 F.2d at 13 (holding that a consulting physician's opinion deserves little weight "because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day") (internal quotation omitted).  Accordingly, the findings of Finkelstein and Tranese do not constitute substantial evidence contradicting Shapiro's opinion.

Dr. Shapiro's opinion that Webster is disabled is also not contradicted by Webster's daily activities.  The ALJ stated in her decision that Webster "remains at home and is able to watch TV and listen to the radio, without being disturbed by any unrelenting pain and discomfort.  She is able to operate a motor vehicle and pursue her legal rights."  R. 37.  This finding misconstrues the evidence.  Webster did testify at the hearing that, because of her pain, she spends most days laying down "on [her] back . . . watching the TV or listening to the radio." R. 774-75.  Webster did not, however, state that she could do these activities "without being disturbed by any unrelenting pain and discomfort."  To the contrary, she testified that she is in pain "all the time," R. 782; *see also* R. 778 ("There's always pain"), which is consistent with her statements to her treating physicians over the years.  *See*, *e.g.*, R. 575 ("Claimant currently complains of daily, persistent, and severe neck and low back pain . . . .").

In sum, Dr. Shapiro's opinion is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with any other substantial evidence in the record. Accordingly, under the regulations, it should have been accorded "controlling weight."  *See* 20 C.F.R. § 404.1527(c)(2).

2.   *The ALJ's Adverse Credibility Finding*

To decide whether a claimant is disabled, the Commissioner must consider the subjective evidence of pain and disability testified to by the claimant. *See* 20 C.F.R. § 416.929(a).  "It is within the discretion of the Secretary to evaluate the credibility of the [claimant's] complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology."  *Gernavage v. Shalala,* 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  The claimant's statements about pain cannot alone establish disability, "there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged," *Davis v. Massanari,* No. 00-cv-4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001), although there need not be "direct medical evidence confirming the extent of the pain." *Snell,* 177 F.3d at 135.

To appropriately assess a claimant's assertions of pain and disability, the regulations provide a two-step process. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)).  At the second step, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a)) (alteration added).

Seven factors are used in evaluating a claimant's subjective complaints: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side

24

effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3)(i)-(vii); *see also Ligon v. Astrue,* No. 11-cv-0162, 2012 WL 6005771, at *17 (E.D.N.Y. Dec. 3, 2012).  If the ALJ decides a claimant's testimony is not credible, the ALJ must set forth the reasons "with sufficient specificity to permit intelligible plenary review of the record."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988); *see also Ligon*, 2012 WL 6005771, at *17; S.S.R. 96–7P, 1996 WL 374186, at *4 (July 2, 1996) ("[T]he adjudicator must . . . give specific reasons for the weight given to the individual's statements.").

> The ALJ here found that Webster's "medically determinable impairments could not reasonably be expected to cause the alleged symptoms to the extent alleged, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not supported by the substantial medical evidence for the period in question and is [sic] not accepted, since they are inconsistent with the above residual functional capacity assessment."  R. 38.  The ALJ provided no further explanation regarding her decision not to credit Webster's testimony.  As conceded by the Commissioner, this is not an acceptable credibility determination under the regulations.  *See* Def. Br. 1 ("[T]he ALJ did not apply the correct legal standards in assessing plaintiff's credibility.").

> The ALJ's conclusion at the first step of the required credibility analysis – that Webster does not suffer from a medically determinable impairment that could reasonably be

25

expected to produce the symptoms alleged – is not supported by substantial evidence.  As related in detail above, there is substantial uncontested evidence in the record that Webster suffers from multiple disc herniations, disc bulges, impingement in the left shoulder, and various other musculoskeletal impairments.  These conditions could reasonably have produced the pain and other symptoms that Webster testified about.[7]

It appears that the ALJ did not proceed to the second step of the credibility analysis.  To the extent that the ALJ impliedly relied on Webster's daily activities to support discrediting her testimony, such a finding is also erroneous.  As noted in the ALJ's decision, Webster is able to operate a motor vehicle and to watch television and listen to the radio while lying on her back.  R. 37.  The record establishes that she can also bathe, dress, and groom herself, depending on the intensity of her pain.  R. 576.  Webster's ability to complete these activities does not conflict with either her stated symptoms or her claim for disability.  *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (claimant's ability to watch television while lying down and to drive and use public transportation does not "materially advance" Commissioner's argument that claimant is able to perform sedentary work).  Being able to perform some of the activities necessary for basic self-upkeep for short periods of time does not conflict with Webster's subjective symptoms or preclude a finding that she is disabled.  *See id.* ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act.") (quoting *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir. 1988)); *see also Kaplan v. Barnhart*, No. 01-cv-8438, 2004 WL 528440, at *3 (E.D.N.Y. Feb. 24, 2004) ("[A]n individual who engages in activities of daily living, especially when these

---

[7]       In both of the previous adverse decisions by an ALJ in this case, Webster's impairments were found to be such that they would reasonably be expected to produce some of her alleged symptoms.  *See* R. 56, 73.

activities are not engaged in 'for sustained periods comparable to those required to hold a sedentary job,' may still be found to be disabled.") (quoting *Balsamo*, 142 F.3d at 81).

I am mindful that "[i]t is the function of the Commissioner, not [a reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (alteration added).  However, I conclude that the ALJ's determination that Webster's subjective complaints should be discredited lacks the requisite substantial evidence in the record. *See Ligon*, 2012 WL 6005771, at *18.

C. *Remedy*

I have carefully considered the factors that inform the decision whether to remand for further proceedings or for calculation of benefits. *See, e.g., Butts v. Barnhart,* 388 F.3d 377, 385-87 (2d Cir. 2004).  If no purpose would be served by remanding for reconsideration, or if an ALJ's behavior hints of bad faith, I may remand solely for the calculation of benefits.  *See Butts* 388 F.3d at 387; *Rosa,* 168 F.3d at 82-83; *Balsamo*, 142 F.3d at 82.  However, if remand for reconsideration might be useful because the ALJ applied an improper legal standard, because there are gaps in the administrative record, or for some other reason, I may remand for reconsideration of whether Webster is disabled.  *See Butts*, 388 F.3d at 387; *see also Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir. 1999).

Because in my view the Commissioner (1) lacked good reasons for refusing to give controlling weight to Dr. Shapiro's assessment of Webster's ability to work, and (2) improperly rejected Webster's own testimony about her chronic disabling pain, there is no basis to conclude that a more complete record might support the Commissioner's decision.[8]  *See*

---

[8]      Although in her written decision the ALJ mistakenly adjudicated only whether Webster was disabled through December 31, 2007, *see* R. 20, at the hearing she developed the record through December 31,

*Primiani v. Astrue*, No. 09-cv-2405, 2010 WL 474642, at *10 (E.D.N.Y. Feb. 5, 2010).  I find that the record here establishes "persuasive proof of disability."  *Parker*, 626 F.2d at 235.  Finally, nearly a full decade has passed since Webster first filed her application for SSD benefits in 2004.  Because "a remand is within the discretion of a district court, the principles calling for some evaluation of relative hardships that govern a discretionary selection of alternative remedies apply, and the hardship to a claimant of further delay should be considered." *Butts*, 388 F.3d at 387; *see also Tomlinson v. Astrue*, No. 11-cv-2477, 2012 WL 346458, at *1 (E.D.N.Y. Feb. 2, 2012).  Accordingly, rather than subject Webster – for a fourth time – to the painfully slow process by which disability determinations are made, a remand solely for the calculation and award of benefits is warranted.

CONCLUSION

For the reasons explained above, the Commissioner's motion to remand for further proceedings is denied.  Webster's motion for judgment on the pleadings is granted and the case is remanded to the Commissioner solely for the calculation and award of benefits.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 14, 2014
      Brooklyn, New York

---

2010, the correct timeframe.  *See* R. 754.  Accordingly, the record covers the entire relevant period in spite of this mistake and remand is not necessary to more fully develop the record for the unadjudicated period.